IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| STUART HYTTINEN, TAMARA HYTTINEN, RICHARD LUICK, and JOYE LUICK, individually and on behalf of all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); TYCO FIRE PRODUCTS, L.P., successor-in-interest to The Ansul Company; JOHNSON CONTROLS INTERNATIONAL, PLC; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAXCORPORATION; CLARIANT CORPORATION;  BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; and CHEMICALS, INC.<br><br>Defendants. | Case No.:<br><br>**COMPLAINT AND JURY TRIAL DEMAND** |

## SUMMARY OF CLAIMS

1.     Plaintiffs, Stuart Hyttinen, Tamara Hyttinen, Richard Luick, and Joye Luick

(*hereinafter* "Plaintiffs"), by and through undersigned counsel, file this action against THE 3M

COMPANY (f/k/a Minnesota Mining and Manufacturing Co.) ("3M");  TYCO FIRE

PRODUCTS, L.P., successor-in-interest to THE ANSUL COMPANY ("TYCO"); JOHNSON

CONTROLS INTERNATIONAL, PLC, successor-in-interest to TYCO FIRE PRODUCTS, L.P. ("JOHNSON CONTROLS"); CHEMGUARD, INC.; NATIONAL FOAM, INC.; BUCKEYE FIRE  EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY, individually and  as  successor  in  interest  to  DuPont  Chemical Solutions  Enterprise; THE CHEMOURS COMPANY FC, LLC, individual and as successor in interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAX CORPORATION; CLARIANT CORPORATION; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX  CORPORATION;  ARCHROMA MANAGEMENT LLC; DEEPWATER CHEMICALS,  INC.; NATION  FORD  CHEMICAL COMPANY; and CHEMICALS, INC. (collectively referred to herein as the "Defendants"), and allege as follows:

2.      Plaintiffs and Class Members are current and former owners of residential real property in The Town of Campbell, Wisconsin (*hereinafter* "the Town") – a Town in which the aquifer suppling water to private household wells has been contaminated by the presence of chemicals manufactured, distributed, and/or discharged by Defendants.

3.      Plaintiffs and Class Members seek to be made whole for their property related harms and losses because their water supplies and residential real property have been contaminated by toxic per- and polyfluoroalkyl substances (*hereinafter* "PFAS") components of aqueous film forming foam (*hereinafter* "AFFF") manufactured, sold, and/or distributed by Defendants with knowledge of and with inadequate warnings of the toxic effects PFAS would cause if they entered and contaminated the environment. Defendants' conduct was without

regard to Plaintiffs and Class Members whose property and property rights would foreseeably be invaded by toxic PFAS components in AFFF once they infiltrated the environment, including groundwater and private wells.

4.      For decades the Defendants manufactured, sold, and/or distributed AFFF, a fire suppressant, and/or its toxic PFAS components, to the City of La Crosse, Wisconsin (*hereinafter* "La Crosse") and La Crosse Regional Airport (*hereinafter* "LSE"), in La Crosse, Wisconsin. LSE is located on French Island, Wisconsin, within the borders of La Crosse. LSE is situated directly adjacent to the Town surrounding its boundaries to the west and south, with the Black River to its east.

5.      Properties in the Private Well Class Geographic Area (*hereinafter* the "Class Area") have obtained their household water supplies from groundwater pumped by private wells accessing an aquifer contaminated with toxic PFAS components from Defendants' AFFF. Plaintiffs' and Class Members' water supply, water systems, piping, soil, vegetation, and other property are contaminated by AFFF, and its toxic PFAS components, including perfluorooctane sulfonate (*hereinafter* "PFOS"), perfluorooctanoic acid (*hereinafter* "PFOA"), perfluoroheptanoic acid (*hereinafter* "PFHpA"), and other species of PFAS manufactured, sold, and/or distributed by Defendants. When consumed, the toxic PFAS components in AFFF can cause numerous serious health impacts.  The presence of toxic PFAS components from AFFF contaminates household water in residential homes and interferes with property rights. PFAS contamination has occurred in the past, is ongoing, and will continue well into the future.

6.      Defendants manufactured AFFF and/or its toxic PFAS components, including fluorochemical surfactants, PFOS, PFOA, and/or certain other PFAS that degrade into PFOS or

PFOA.  As the manufacturers of AFFF, and its toxic PFAS components, the Defendants knew or should have known since at least the 1960s and 1970s that the inclusion of toxic PFAS components in AFFF presented an unreasonable risk to human health and the environment.  Defendants also knew or should have known by that time that toxic PFAS components are highly soluble in water, and highly mobile and persistent in the environment, and highly likely to contaminate residential real property water supplies and soil if released to the environment.

7.      Nonetheless, Defendants manufactured, marketed, sold, and/or distributed their products with knowledge that large quantities of AFFF, and its toxic PFAS components, would be used in fire training exercises and emergency situations, including at LSE, in such a manner that toxic PFAS components would be released into the environment. Defendants knew or should have known that even when used as intended by the products' design, discharge of toxic PFAS components into the environment was certain to cause environmental and health hazards.

8.      Plaintiffs and Class Members household water supplies have been contaminated for years, if not decades, by toxic PFAS components including at concentrations hazardous to human health.

9.      Residential real properties in the Class Area have been contaminated with toxic PFAS components.

10.     For decades La Crosse and LSE routinely used Defendants' AFFF products as intended in fire training exercises, fire suppression, annual testing, and for other purposes. As a result, toxic PFAS components that Defendants used in their AFFF migrated into the groundwater surrounding LSE and contaminated private wells used to provide household water supplies to properties in the Class Area.

11.     Sampling and testing in the Class Area have detected toxic PFAS components from AFFF used at LSE.

12.     Plaintiffs and the Class Members seek compensation for: decrease in the value and marketability of their property and property rights which PFAS contamination has diminished and will continue to diminish; the need for and the cost of remediation of Plaintiffs' and Class Members' properties and/or mitigation systems for those properties; costs incurred for alternative water supplies; the loss of use of their properties; loss of use and enjoyment of their properties; and their annoyance, discomfort, and inconvenience caused by the contamination of their properties by Defendants' AFFF and toxic PFAS components.

13.     Plaintiffs bring this suit on behalf of themselves and all current and former residential real property owners in the Class Area to recover property related harms and losses related to the interference with property rights caused by Defendants' tortious conduct in the manufacture, sale, and/or distribution of AFFF and its toxic PFAS components.

## PARTIES

### A.  Plaintiffs

14.     Plaintiffs are individuals, all of whom, at all relevant times to this action, owned and/or used private drinking wells within the Class Area, and were exposed to and ingested toxic PFAS components for at least one year over the past five decades of LSE's use of Defendants AFFF.

15.     Plaintiffs, Stuart and Tamara Hyttinen, at all relevant times to this action, were and are residents of the Town, within the Class Area. Stuart and Tamara Hyttinen have suffered significant harms and losses because of PFAS contaminated household water supply

5

caused by LSE's use of Defendants PFAS-based AFFF as describe below.  At all times relevant hereto Stuart and Tamara Hyttinen have been husband and wife and joint owners and occupiers of that property and home located thereon at 2545 1st Avenue East, La Crosse, Wisconsin.

16.     Plaintiffs, Richard and Joye Luick, at all relevant times to this action, were and are a resident of the Town, within the Class Area. Richard and Joye Luick have suffered significant harms and losses because of PFAS contaminated household water supply caused by LSE's use of Defendants PFAS-based AFFF as describe below.  At all times relevant hereto Richard and Joye Luick have been husband and wife and joint owners and occupiers of that property and home located thereon at 2555 Bainbridge Street, La Crosse, Wisconsin.

**B.  Defendants**

17.     Defendant 3M is a corporation organized under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133. Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS to airports, including LSE.

18.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

19.     Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

20.     In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

///

21.     On information and belief, beginning in 2011, Amerex designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, including but not limited to PFOA and PFOS.

22.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

23.     Tyco manufactures the Ansul brand of products and is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

24.     Beginning in or around 1975, Ansul designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, including but not limited to PFOA and PFOS.

25.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, sell, and/or distribute AFFF products containing PFAS, including but not limited to PFOA and PFOS.

26.     Defendant, Johnson Controls is a corporation organized and existing under the laws of Ireland, having a principal place of business at 5757 N. Green Bay Ave., Milwaukee, WI 53209. On or about September 2, 2016, Johnson Controls merged with a subsidiary of Tyco's parent company, Tyco International plc, named Jagara Merger Sub LLC. Johnson Controls was the surviving corporation. After the merger, Tyco International plc changes its name to Johnson Controls International plc.

27.     Tyco is an indirect subsidiary wholly owned by Johnson Controls. Since on or around September 2, 2016, Tyco and Johnson Controls have maintained service agreements under which Johnso Controls provides certain services, including environmental consulting and management, to Tyco. Since that time, Johnson Controls has authorized, supervised, directed,

performed, or failed to perform the acts alleged in this Complaint.

28.     Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

29.     Chemguard is an indirect subsidiary wholly owned by Johnson Controls, acquired by Tyco in 2011.

30.     On information and belief, Chemguard designed, manufactured, marketed, sold, and/or distributed AFFF products containing PFAS, including but not limited to PFOA and PFOS.

31.     On information and belief, Chemguard was acquired by Tyco International Ltd. In 2011.

32.     On information and belief, 3M and Chemguard also designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

33.     Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

34.     On information and belief, Buckeye designed, manufactured, marketed, sold, and/or distributed AFFF products containing PFAS, including but not limited to PFOA and PFOS.

35.     National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

///

36.     Beginning in or around 1973, National Foam designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, including but not limited to PFOA and PFOS.

37.     On information and belief, National Foam currently manufactures the Angus brand of AFFF products and is a subsidiary of Angus International Safety Group.

38.     On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

39.     At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF containing PFAS that was used for training and to fight fires at airports throughout the United States, including LSE.

40.     On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

41.     On information and belief, Chubb was acquired by William Holdings in 1997.

42.     On information and belief, Angus Fire Annour Corporation had previously been acquired by Williams Holdings in 1994.

43.     On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

44.     On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

///

45.     On information and belief, Angus Fire Armour Corporation and National Foam separated from United Technologies Corporation in or around 2013.

46.     Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc. ("Kidde"), is a Massachusetts corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant to the present litigation, Kidde designed, manufactured, and sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations, including at LSE.

47.     Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

48.     On information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation.

49.     On information and belief, Kidde-Fenwal is the entity that divested the AFFF business unit now operated by National Foam in 2013.

50.     Kidde-Fenwal is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant to this litigation, Kidde-Fenwal designed, manufactured, sold, and/or distributed AFFF used in training operations and for emergency fire-fighting situations, including at LSE.

51.     Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to Kidde-Fenwal.

52.     Upon information and belief, the Canadian Intellectual Property Office has registered the National Foam trademark to Kidde-Fenwal, Inc., formerly registered to Kidde Fire

10

Fighting, Inc.

53.     UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc. ("UTC Fire"), is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.  At all times relevant to this litigation, UTC Fire designed, sold, and/or distributed AFFF used for training operations and fighting fires, including at LSE.

54.     Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

55.     Enterra Corporation ("Enterra") is a Massachusetts corporation.  At all times relevant, Enterra designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous airports, including at LSE.

56.     Upon information and belief, Enterra is the current holder of the National Foam trademark.

57.     Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

58.     On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde- Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde- Fenwal's design, manufacture, marketing, sale, and distribution of AFFF.

59.     National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., individually and as successor in interest to National Foam, Inc.;

Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; Kidde-Fenwal, Inc., individually and as successor in interest to National Foam, Inc.; UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc.; Enterra Corporation;  and Carrier Global Corporation, individually and as successor in interest to National Foam, Inc. are collectively referred to herein as "National Foam."

60.     At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at LSE.

61.     Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

62.     Arkema develops specialty chemicals and polymers.

63.     Arkema is an operating subsidiary of Arkema France, S.A.

64.     Arkema is a successor in interest to Elf Atochem North America ("Elf Atochem") and Atofina Chemicals Inc ("Atofina").

65.     On information and belief, Arkema designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

66.     Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

///

12

67.     On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

68.     On information and belief, BASF Corporation is the successor in interest to Ciba- Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc. ("Ciba-Geigy"), Swiss specialty chemicals companies.

69.     Ciba-Geigy manufactured and sold PFAS or PFAS components for use in AFFF, including at LSE.

70.     Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

71.     On information and belief, ChemDesign designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

72.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

73.     On information and belief, Deepwater Chemicals designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

74.     Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

///

75.     On information and belief, Dynax entered the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

76.     On information and belief, Dynax designed, manufactured, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

77.     DuPont Chemical Solutions Enterprise ("DuPont Chemical") was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19898.

78.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

79.     In a letter addressed to the Office of Pollution Prevention and Toxics ("OPPT") Document Control Office, dated May 14, 2003, and signed by Stephen H. Korzeniowski, DuPont provided its list of telomer-based sales products in the United States for the year 2002.

80.     The letter, which was redacted and sent to the United States Environmental Protection Agency (*hereinafter* "EPA") under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

81.     At all times relevant to the present litigation,  DuPont Chemical designed,

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621, last accessed 9.22.20.

manufactured and sold AFFF used for training and to fight fires at numerous locations including airports across the United States.

82.     Defendant, E.I. Du Pont de Nemours and Company ("E.I. DuPont"), successor in interest to DuPont Chemical, is a Delaware Corporation and does business throughout the United States, including conducting business in Wisconsin. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

83.     At all times relevant to the present litigation, E.I. DuPont designed, manufactured and sold AFFF used for training and to fight fires at numerous airports and other locations throughout the country, including LSE.

84.     Defendant The Chemours Company ("Chemours"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in Wisconsin. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19889.

85.     Chemours was incorporated as a subsidiary of E.I. Du Pont as of April 30, 2015. From that time until July 2015, Chemours was a wholly owned subsidiary of E.I. Du Pont. In July 2015, E.I. Du Pont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which included the fluoroproducts business, distributing shares of Chemours stock to E.I. Du Pont stockholders, and Chemours has since been an independent, publicly traded company.

86.     Upon information and belief, at all times relevant to the present litigation, Chemours designed, manufactured,  and sold AFFF used for training and to fight fires at numerous airports and other locations throughout the county, including LSE.

///

15

87.     E.I. Du Pont merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. ("DowDuPont"). E.I. Du Pont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has affected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

88.     Defendant The Chemours Company FC L.L.C. ("Chemours Company"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in Wisconsin. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

89.     Upon information and belief, at all times relevant to the present litigation, Chemours Company designed, manufactured and sold AFFF used for training and to fight fires at numerous airports and other locations throughout the country, including LSE.

90.     Defendant DuPont de Nemours Inc. ("DuPont"), f/k/a DowDuPont, is a Delaware Corporation that conducts business throughout the United States, including business in Wisconsin. Its principal place of business is 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

91.     Upon information and belief, at all times relevant to the present litigation, DuPont de Nemours manufactured, designed and sold AFFF and/or PFAS constituents in AFFF that was used at LSE.

92.     Defendant Corteva, Inc. ("Corteva") is a Delaware Corporation that conducts business throughout the United States, including business in Wisconsin. Its

16

principal place of business is 974 Centre Rd., Wilmington, Delaware 19805.

93.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

94.     Corteva, Inc. was initially formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

95.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of DuPont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

96.     At all times relevant to the present litigation, Corteva designed, manufactured and sold AFFF and/or PFAS constituents in AFFF that was used at LSE.

97.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva, Inc.

98.     Defendants E. I. DuPont; Chemours; Chemours Company; Corteva; and New DuPont are collectively referred to as "DuPont" throughout this Complaint.

99.     On information and belief, DuPont designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

///

100.    Defendant AGC Chemicals Americas, Inc. ("AGC Americas") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

101.    On information and belief, AGC Americas was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405, Japan.

102.    AGC Americas manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

103.    On information and belief, AGC Americas designed, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

104.    Defendant Archroma Management, LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

105.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

106.    On information and belief, Archroma designed, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

///

///

107.     Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

108.     On information and belief, Chemicals, Inc. supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

109.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

110.     Upon information and belief, Clariant was formerly known as Sandoz Chemicals Corporation ("Sandoz") and as Sodyeco, Inc ("Sodyeco").

111.     On information and belief, Clariant is the successor in interest to the specialty chemical business of Sandoz. On information and belief, Sandoz spun off its specialty chemical business to form Clariant in 1995.

112.     Clariant, Sandoz, and/or Sodyeco manufactured and sold PFAS or PFAS constituents for use in AFFF, including at LSE.

113.     On information and belief, Clariant supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

114.     Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

///

115.     Upon information and belief, Nation Ford supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

116.     Upon information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

117.     Upon information and belief, the Defendants supplied, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at LSE.

118.     All Defendants, at all times material herein, acted by and through their respective agents, servants, officers, and employees, actual or ostensible, who were acting within the course and scope of their actual or apparent agency, authority or duties, Defendants are liable based on such activities, directly and vicariously.

119.     Defendants represent all or substantially all the market for AFFF and its toxic PFAS components used and released at LSE.

## JURISDICTION AND VENUE

120.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because some members of the proposed Plaintiff class are citizens of state different from at least some of Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

121.     Venue is proper in this court pursuant to 28 U.S.C. § 1391 because events or omissions by Defendants giving rise to the claims asserted herein occurred in this District, have

caused harm to Class Members residing in and to real property in this District and Plaintiffs and Class Members reside in this District.

## GENERAL ALLEGATIONS

122.    PFAS are manmade chemicals that do not exist in nature. Defendants manufactured and/or used toxic PFAS components to produce AFFF which was sold and/or distributed to airports across the United States, including LSE.

123.    PFAS are persistent in the environment. Due to the strength of multiple carbon-fluorine bonds, PFAS break down slowly in the environment, are chemically biologically stable, resistant to environmental degradation, and can persist in the environment for decades. PFAS are also water soluble, making them mobile in groundwater and the environment.

124.    Toxicology studies show that PFAS are readily absorbed after oral exposure and accumulate in the human body.

125.    There are numerous health risks associated with exposure to PFAS. For example, PFOS and PFOA exposure is associated with increased risk in humans of testicular cancer and kidney cancer, disorders such as thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.[2] The EPA has also advised that exposure to PFAS may result in developmental effects to fetuses during pregnancy or to breast-fed infants.[3]

126.    Defendants' AFFF, and its toxic PFAS components, released at LSE migrated, and are migrating, from areas of release at or around LSE to the wells throughout the Town and have entered and contaminated Plaintiffs' and Class Members' residential real property, water

---

[2] https://www.epa.gov/sites/production/files/201605/documents/drinkingwaterhealthadvisories_pfoa_pfos_5_19_16.final_.1.pdf

[3] *Id.*

supplies, water systems, wells, piping, soil, vegetation, and other property.

127.    AFFF use for fire suppression and other activities at LSE dates from the 1970s through at least 2020. Storage of AFFF persists at LSE.

128.    Toxic PFAS components from AFFF released at LSE have migrated, and continue to migrate, to areas of release on LSE to wells throughout the Class Area and have entered and contaminated Plaintiffs' and Class Members' residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property.

129.    Groundwater and surface water released from, and in connection with, LSE flows to the wells throughout the Class Area.

130.    Plaintiffs and Class Members owned and/or resided in residential real properties with private household wells within the Class Area.

131.    Concentrations of toxic PFAS components found in the private wells serving Plaintiffs' and Class Members' water supplies have been caused by releases of Defendants' AFFF, and its toxic components, on and around LSE property.  As was reasonably foreseeable by the Defendants, AFFF containing toxic PFAS components was discharged onto open ground and surface waters during fire training, fire suppression, and other exercises.  As was reasonably foreseeable by Defendants, AFFF, and its toxic PFAS components, migrated into and through the soil in and around LSE to the groundwater under LSE. From there, Defendants' AFFF, and its toxic PFAS components, migrated to Plaintiffs' and Class Members' private groundwater wells in the Class Area. The Class Area's PFAS contamination is directly and proximately linked to Defendants' manufacture, sale, and/or distribution of AFFF.

132.    Because of Defendants' tortious conduct in manufacture, sale, and/or distribution of AFFF containing toxic PFAS components, Plaintiffs and Class Members have

been forced to cease use of their private household wells because PFAS have contaminated their water supply.

133.    Plaintiffs and Class Members took, and continue to take, delivery of a substitute water supply out of necessity to avoid consumption of PFAS contaminated water caused by Defendants' AFF.

134.    Thus, Defendants, through their development, manufacturing, marketing, sale and/or distribution of AFFF, and its toxic PFAS components; by its tortious conduct proximately caused Plaintiffs' and Class Members' harms and losses by contaminating the groundwater.

## PFAS ARE USED IN AQUEOUS FILM FORMING FOAM

135.    PFAS are synthetic carbon chain compounds that are not naturally occurring and contain large amounts of the element fluorine. As used in this Complaint, the term "PFAS" includes all PFAS and their precursors, derivatives, and/or salts used in the AFFF released at LSE which contaminated Plaintiffs' and Class Members' water supplies and property, including inter alia, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA.

136.    PFAS are used in firefighting foam known as "aqueous film forming foam" ("AFFF").

137.    AFFF is used to extinguish fires that involve petroleum or other flammable liquid because PFAS are resistant to heat, oil, grease, and water.

138.    3M AFFF is produced through a 3M process called electrochemical fluorination, or ECF, contained PFAS including PFOS. Tyco and other Defendants' AFFF are synthesized through telomerization and contain PFAS including PFOA. Both processes include formulations containing chemicals that can break down into other toxic PFAS components.

139.     Defendants each manufactured, sold, and/or distributed AFFF, and its toxic PFAS components, to airports across the United States, including to LSE.

140.     Defendants chose to include and/or distribute toxic PFAS components as ingredients in the AFFF sold and distributed to AFFF users, including LSE, despite the availability of other technologically feasible, practical, and effective alternatives that would have reduced or mitigated Plaintiffs' and Class Members' exposure to toxic PFAS.

141.     Defendants knew or should have known that the AFFF, and its toxic PFAS components, sold, and/or distributed to AFFF users, including LSE, would be released into the environment and contaminate groundwater and household water supplied, including Plaintiffs' and Class Members' household water supplies.

142.     Defendants knew or should have known that their harmful and defective products, AFFF containing toxic PFAS components, would be used for various purposes at airports including, but not limited to, training for firefighting, testing firefighting equipment, actual firefighting, and use in hangar sprinkler fire suppressant systems, which would cause the AFFF to drain into the ground and pollute or contaminate the groundwater beneath the airports and eventually migrate into Plaintiffs' and Class Members' household water supplies.

**PFAS Including PFOA and PFOS Threaten Human Health**

143.     PFAS are extremely persistent and bioaccumulate[4] in the human body. Even short-term exposure results in a body burden that persists for years and can increase and biomagnify[5] with continued exposure. When consumed PFAS accumulate primarily in the bloodstream, kidneys, and liver. Humans absorb toxic PFAS components from AFFF when they

---

[4] Bioaccumulation is a process which occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism or excretion.
[5] Biomagnification is a process which occurs when concentration of a substance in organisms tissue increases as the substance travels up the food chain.

consume AFFF contaminated household water.

144.    The EPA projects that PFOS has a half-life of 5.3 years, PFOA has a half-life of

2.3-3.8 years, and PFHxS has a half-life of 8.5 years, in humans.[6] Because of these extended

half-lives, the EPA expects that "it can reasonably be anticipated that continued exposure could

increase body burden to level that would result in adverse outcomes."[7]

145.    EPA Health Advisories have identified numerous health risks associated with

exposure to toxic PFAS components. Studies show association between increased PFOA and

PFOS levels in blood and increased risk of several adverse health effects, including high

cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-

eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and

testicular cancer.

146.    The EPA classified PFOA and PFOS as having suggestive evidence of

carcinogenic potential in humans.[8]

147.    The EPA cited reports from the Organization for Economic Co-operation and

Development (*hereinafter* "OECD") in the May 2016 Health Advisories. The OECD is an

international intergovernmental organization that meets, discusses issues of concern, and works

to respond to international problems.

148.    According to a published OECD Report, for mammalian species, PFOA and its

salts have caused cancer in rats and adverse effects on the immune system in mice. In addition,

PFOA and its salts can display reproductive or developmental toxicity in rodents at moderate

levels of exposure, and moderate to high systemic toxicity in rodents and monkeys following

---

[6] A half-life is the amount of time it takes for fifty percent of a contaminant to leave the body.
[7] EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, pp. 1, 8-9, December 30, 2009.
[8] EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 3-159, May 2016; EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), p. 3-114, May 2016.

long-term exposure by the oral route.[9] The OECD also concluded in a Hazard Assessment that

PFOS is persistent, bioaccumulative, and toxic to mammalian species.[10]

149.     The EPA also cited findings from a C-8 Science Panel and Health Project in the

May 2016 Health Advisory for PFOA. The C-8 Science Panel was formed out of a class action

settlement related to PFOA contamination of groundwater from a manufacturing facility in West

Virginia. The C-8 Health Project is the largest study evaluating human exposure and health

endpoints for PFOA; the study included more than 65,000 people in Mid-Ohio Valley

communities who were exposed to PFOA for longer than 1 year. The C-8 Science Panel consisted

of three epidemiologists and its goal was to assess the links between PFOA and numerous

diseases. The C-8 Science Panel carried out studies of exposure and health studies between 2005

and 2013; information was gathered through questionnaires and blood samples from the

individuals who had PFOA contaminated drinking water and previously published studies.

150.     The C-8 Science Panel released reports which found probable links between

exposure to PFOA and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular

cancer, kidney cancer, and pregnancy-induced hypertension.

151.     The U.S. Agency for Toxic Substances and Disease Registry (*hereinafter*

"ATSDR") stated in its 2018 draft Toxicological Profile that studies suggest associations

between PFOA and PFOS exposure and liver damage, pregnancy-induced hypertension,

increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk

of decreased fertility, low birth weight, and increases in testicular and kidney cancers.

152.     In February 2018, WDNR stated that PFAS compounds meet the definition of

---

[9] OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007.
[10] OECD, Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts, p. 5, November 21, 2002.

hazardous and/or environmental pollution under Wis. Stat. § 292.01. Three years later, prevalence of PFAS contamination in the Class Area led WDHS to declare an emergency water advisory for the area.

153.    Defendants knew or reasonably should have known about the environmental and health effects from toxic PFAS components, discussed above, at the time they developed, manufactured, marketed, sold, and/or distributed AFFF containing toxic PFAS components to airports around the United States, including LSE.

**PFAS, Including PFOA and PFOS, Pose a Threat to the Private Household Wells Relied on by Plaintiffs and Class Members**

154.    PFAS are extremely persistent in the environment because they are chemically and biologically stable and are resistant to environmental degradation. The EPA projects that PFOS has an environmental half-life in water of over 41 years, and PFOA has an environmental half-life in water of over 92 years. PFOA and PFOS are also considered to be resistant to degradation in soil. EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, p. 1, December 30, 2009.

155.    PFAS also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

156.    Additionally, non-human receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, and humans, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species.  PFOS is linked to developmental, reproductive, and systemic toxicity.

157.    PFOA is also readily absorbed by plants, including wild plants as well as crops grown on contaminated soil and bioaccumulates in the food chain.

158.     These effects impair use of Plaintiffs' and Class Members' household water and other property throughout the Class Area.

159.     Upon information and belief, Defendants knew or should reasonably have known about the environmental effects from toxic PFAS components, discussed above, at the time they developed, manufactured, marketed, sold, and/or distributed AFFF, and its toxic PFAS components.

**Defendants Knew of AFFF Toxicity and Failed to Provide Notice**

160.     Instructions, labels, and material safety data sheets (*hereinafter* "MSDS") were provided with AFFF and the toxic PFAS components used in AFFF sold by Defendants, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which Defendants knew or should have known.

161.     Defendants knew of these health and environmental hazards for years and, at least at significant times, failed to disclose this information to, and actively hid it from, their customers, including LSE.

(i)     1940s and 1950s: Early Warnings About the Persistence of AFFF

162.     In 1947, 3M created its fluorochemical program, and within four years, it began selling PFOA to DuPont. The persistence and contaminating nature of fluorosurfactants contained in AFFF products were understood prior to their commercial application.

163.     The inventor of 3M's ECF process, J.H. Simons', 1948 patent for the ECF process reported that fluorosurfactants produced by the process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural

28

processes in the environment.[11]

164.     3M knew as early as the mid-1950s that PFAS bio-accumulate in humans and animals.

165.     A 1956 study at Stanford University concluded that PFAS manufactured by 3M bind to proteins in blood.

166.     Nowhere in any MSDS for any of Defendants' AFFF, or its toxic PFAS components, is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFAS and fluorosurfactants used in AFFF products to customers is a failure to warn just how indestructible the AFFF's toxic PFAS ingredients are when released to unprotected water sources and even treatment plants.

          (ii)    1960s: AFFF's Environmental Hazards Are Reinforced

167.     By the early 1960s, 3M understood that PFAS are stable, persist in the environment, and do not degrade.

168.     DuPont company scientists issued internal warnings about the toxicity associated with their PFOA as early as 1961.

169.     One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[12]  Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soil and groundwater.

170.     DuPont Toxicology Section Chief opined that such products should be "handled

---

[11] Simons, J.H., Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, 1950, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

[12] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry, (1964), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

with extreme care," and that contact with the skin should be "strictly avoided."

171.     By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

> (iii)     1970s: International Studies Provide Evidence of Environmental and Health Risks

172.     In 1970, the authors of a scientific journal article observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

173.     Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

174.     An internal memorandum from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."[13]  Hence, 3M understood at the very least that the fluorosurfactant used in its AFFF products would, in essence, never degrade once released into the environment.

175.     By the mid-1970s, 3M and Ansul (and possibly other Defendants) had an intimate understanding of the persistent nature of PFAS. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely

---

[13] Memorandum from H.G. Bryce to R.M. Adams re : Ecological Aspects of Fluorocarbons, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

fluorinated."[14]

176.     In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality.[15]  Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic . . . improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness."  Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Defendant) ever pursued such initiatives.

177.     A 1978 study by 3M on PFAS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

178.     In 1978, based on information DuPont received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

179.     By 1979, DuPont's blood sample data indicated workers exposed to PFOA had significantly higher incidence of health issues than unexposed workers. DuPont did not report this data or the results of its workers health analysis to any government agency or community.

---

[14] Technical Report Summary, August 12, 1976 [3MA01252037].

[15] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a050508.pdf.

180.    In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

181.    That same year, 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify the EPA of its finding.[16]

182.    In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

(iv)    <u>1980s and 1990s: Evidence of AFFF Health Risks Compound</u>

183.    By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to government entities as required by law, or otherwise publicly disclosed.

184.    In 1980, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable." Not only did DuPont know PFOA accumulates in human tissue, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

185.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and

---

[16] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[17]

186.     A subsequent rat study in 1982 which DuPont reported to the EPA showed PFOA crossing the placenta and presence in the maternal blood, DuPont concealed the results of these internal studies from its own plant workers.

187.     No later than 1984, DuPont was aware that PFOA is also biopersistent.

188.     DuPont had long been aware that PFAS it released, and was releasing, from its facilities were leaching into groundwater used for public drinking water.

189.     In 1984, after obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

190.     DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

191.     DuPont chose not to use either available technologies or replacement materials, despite full knowledge of PFOA's toxicity.

192.     During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

193.     They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

---

[17] C-8 Blood Sampling Results, *available at* http://tiny.cc/v8z1mz.

194.     In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo:

> [W]e must view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[18]

195.     A 1997 MSDS for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

196.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M, DuPont, and Dynax Corporation, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver and pancreatic).

(v)     Defendants Hid a Known Toxic Chemical from the Government and the Public

197.     The potential loss of tremendous profits from PFAS drove 3M to engage in a deliberate campaign to influence the science related to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

198.     A key priority of an internal 3M committee was to "[c]ommand the science"

---

[18] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

199.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit the drafts of papers on PFAS and sought control over when or whether these papers were published at all.

200.    Under pressure from the EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier. 3M press release, "3M Phasing Out Some of Its Specialty Materials", May 16, 2000.

201.    3M, who was the predominant manufacturer of AFFF, ceased production of PFOS based AFFF in 2002.[19]

202.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree." EPA internal memo, "Phaseout of PFOS", May 16, 2000.[20]

203.    In contrast, 3M's news release insisted that "our products are safe" while extolling their "principles of responsible environmental management" as driving the cessation of production.[21]

---

[19] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1, last accessed 9.22.20.
[20] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0629.pdf#page=2n, last accessed 9.22.20.
[21] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1, last accessed 9.22.20.

204.     In 2001, the Firefighting Foam Coalition (*hereinafter* "FFFC"), an AFFF trade group, was formed to advocate for AFFF's continued viability on behalf of the Defendants. DuPont, which as described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC along with many other AFFF manufacturers, including Ansul, Buckeye, Chemguard, and Dynax.[22] Through their involvement in the FFFC, as well as a variety of other trade associations and groups, Defendants shared knowledge and information regarding PFOA. The Defendants worked together to protect AFFF from scrutiny including close cooperation included regarding messaging on PFOA's toxicological profile.

205.     The FFFC's efforts were designed to shield its members and the AFFF industry, including Defendants, from the detrimental impact of the public and regulators learning about the harms of PFAS to human health and the environment. Defendants regularly published newsletters and attended conferences bolstering their AFFF products. Coordinated efforts between FFFC and Defendants were meant to dispel concerns about the impact toxic PFAS components in their AFFF have on the environment and human health. They FFFC and Defendants worked in concert to conceal known risks of their AFFF, and its toxic PFAS components, from the government and public.

206.     DuPont's Epidemiology Review Board (*hereinafter* "ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis for [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

---

[22] Fire Fighting Foam Coalition, Fact Sheet on AFFF Fire Fighting Agents, P62888 AFFF Fact Sheet (Page 1) (ewg.org) (listing founding members of the FFFC).

207.     In the 1970s, Defendants began making AFFF with toxic PFAS components, including shorter carbon chain PFAS. Upon information and belief, those other toxic PFAS components also are highly soluble, persistent, bio-accumulative, and toxic to humans.

208.     AFFF, and its toxic PFAS components, were sold and/or distributed to La Crosse by Defendants. Thereafter, Defendants' AFFF was stored, used, released, discharged, and disposed of at LSE, which has contaminated Plaintiffs' and Class Members' household water supplies. For instance, toxic PFAS components have been detected in groundwater samples collected from the Plaintiffs' and Class Members' private household water supply wells.

209.     The Defendants continued to manufacture, sell, and/or distribute AFFF containing toxic PFAS components sold to La Crosse and used at LSE.

210.     Concentrations of toxic PFAS components from Defendants' AFFF found in the wells throughout the Town have been caused by LSE's releases of Defendants' AFFF into the environment. As was reasonably foreseeable by Defendants, the training, fire response, and other uses of AFFF occurred on, and/or resulted in discharges to, open ground and stormwater systems. As was reasonably foreseeable by Defendants, the toxic PFAS components in AFFF migrated into and through the soil and groundwater and from there migrated to and contaminated soil and groundwater on or beneath property owned by the Plaintiffs and Class Members and contaminated the groundwater, household water supply, water supply systems, wells, piping, soil, vegetation, and other property. The PFAS contamination of Plaintiff' and Class Members' property has been, and is, directly caused by Defendants' manufacture and/or distribution and sale of AFFF, and its toxic PFAS components.

211.     It was and is reasonably foreseeable to Defendants that the Plaintiffs' and Class Members' property rights and interests would be, and will be, harmed by contamination resulting

from releases of AFFF, and its toxic PFAS components, at and around LSE.

212.    Defendants knowingly manufactured, sold, and/or distributed a dangerous and defective product, AFFF containing toxic PFAS components, failed to provide sufficient warnings to the Plaintiffs and Class Members, and failed to recall their products when they took them off the market and/or knew them to present a hazard to human health.

213.    Defendants' internal memorandums proclaimed that "no reason" existed to alert outside agencies or the public to the toxic characteristics of PFAS despite repeated, consistent internal studies concluding PFAS are toxic, bioaccumulate, biomagnify, and are persistent in the environment and in human tissue. Defendants' failure to act on such information made it practically certain that a known toxic substance, PFAS, would continuously stream into the environment and contaminate Plaintiffs' and Class Members residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property. As a direct and proximate cause of the costs Plaintiffs and Class Members have suffered and will continue to suffer harms and losses in the form of contaminated residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property.

214.    Defendants knowingly manufactured, sold, and/or distributed a dangerous and defective product, AFFF containing toxic PFAS components, failed to provide sufficient warnings to protect bystanders, such as the Plaintiffs and Class Members, and failed to recall or redesign their products when they took them off the market and/or knew them to present a hazard to human health and Plaintiffs' and Class Members' property rights and interests.

215.    Non-PFAS based products were available for fire suppression that would not have led to contamination of Plaintiffs' and Class Members' private drinking water supply.

///

216.     Upon information and belief, Defendants control a substantial share of the market in the United States for AFFF containing toxic PFAS components and are jointly responsible for the contamination of the groundwater, soil, and household water supplies in the Class Area and causing the harms and losses the Plaintiffs and Class Members have and will suffer.

**The Use, Storage, Release, Discharge, and Disposal of PFAS from AFFF at LSE Has Contaminated Plaintiffs' and Class Members' Water Supply, and Properties**

217.     La Crosse began purchasing and using AFFF containing toxic PFAS components at LSE in about 1970.

218.     Over the following fifty years LSE discharged and disposed of AFFF containing toxic PFAS components in and around the airport. LSE's discharge and disposal of AFFF, and its toxic PFAS component, has included, but is not limited to, releases and discharges into soil and water pathways that connect to property, groundwater, household water supplies, household water systems within the Class Area. Such AFFF discharges containing toxic PFAS components have resulted in infiltration of soil and migrated into groundwater and water supply throughout the Class Area.

219.     For instance, testing, training, exercises, and fire response activities occurred on and around LSE, causing AFFF waste containing toxic PFAS components to drain into soil, groundwater, surface waters, wetlands, ponds, and ditches. Toxic PFAS components, discharged to soil, surface waters, wetlands, and ponds have migrated into groundwater and contaminated the groundwater throughout the Class Area where Plaintiffs and Class Members wells are located, contaminating Plaintiffs' and Class Members' property and water supply.

220.     As of January 12, 2021, La Crosse reported to the public that it had completed PFAS testing of well water samples from 109 private wells, with 108 of said wells testing

positive for PFAS.

221.    Months later, proof of French Island's pervasive contamination was reinforced. As of June 2021, 538 private wells on French Island tested positive for PFAS contamination.

222.    The widespread contamination led WDHS to declare an emergency water advisory for the area in March 2021. Levels of PFOA and PFOS in household water wells on French Island had, at that time, been detected and reported at concentrations as high as 3,200 ppt.

**Specific Release, Discharge, Disposal, and Storage of PFAS-Based AFFF at LSE**

223.    Studies have preliminarily identified groundwater, surface water, and soil pathways where toxic PFAS components in AFFF used on and around LSE has been, and is, migrating to the Plaintiffs' and Class Members' groundwater and household water wells.

224.    Initial Site Investigation Work Plan submitted by La Crosse to WDNR identified five potential source areas of PFAS contamination on French Island originating on LSE property: (1) Former Test Burn Pits: (2) a 1997 Fuel Spill, where AFFF was applied over the spilled jet fuel; (3) AFFF Test Area, where AFFF was discharged while annually collecting FAA-required sampled from firefighting equipment; (4) Former Fire Station, where AFFF was stored and transferred into firefighting equipment; and (5) 2001 Crash site, where AFFF was applied to wreckage. While these were the preliminarily identified sites, subsequent information indicates additional releases and discharges of AFFF occurred in LSE operations.

225.    Upon information and belief, Defendants began selling and distributing AFFF to La Crosse and/or LSE in the 1970s. Shortly thereafter, La Crosse and/or LSE created test burn pits in an area northwest of what is presently designated runway 22, east of runway 18, and north of runway 31. Firefighting training using AFFF was conducted at test burn pits at the airport from the 1970s through approximately 1988.

226.    In or about January 1997, a jet fuel spill occurred near an LSE terminal, and LSE firefighters applied AFFF to the spilled jet fuel.

227.    Over an approximately twenty-year period La Crosse and/or LSE conducted nozzle testing using AFFF in a test area northwest of the LSE fire station.

228.    For years, AFFF was stored in the former LSE fire station, where firefighters transported AFFF from the fire station into their equipment.

229.    In June 2001, a jet aircraft crash at LSE resulted in a fire. Upon information and belief, the Airport Fire Department owned and operated by La Crosse responded to the crash and sprayed AFFF at the crash site.

230.    An April 2021 Interim Site Investigation Report revised the above list to include a December 1, 2020, event when an AFFF solution was released from emergency response equipment by LSE personnel on or around a terminal apron.

231.    The Interim Site Investigation listed the above "confirmed sources" along with several "potential sources." Including:

        (a) Practice burn activities near Fisherman Road (just outside the airport) reported
            by citizens during the 1970s.

        (b) An aircraft crash on or about November 9, 1970, at 609 Dakota Street,
            northwest of the airport, across Lakeshore Drive. A La Crosse Tribune article,
            dated 11/10/1970, states, "Kenneth Kearns, La Crosse assistant fire chief, said
            two engines, a foam truck, a water wagon and a rescue unit answered the call."
            Additionally, the article states, "Dried foam covered plane wreckage like a
            snowy mist. Kearns said firemen didn't notice any flames, but put the foam on
            as a precautionary measure." A photo caption accompanying the article states,

"Foam Sprayed on Wreckage By La Crosse Fire Department To Prevent Fire" and depicts firefighting foam on the wreckage and on the ground.

(c) A de-icing truck caught fire on January 3, 2014, at the terminal apron and airport fire responders and LCFD responded to the fire. Extinguishing agents used were described as "75 gallons of AFFF used and about 700 gallons of water" in the "ARFF [Aircraft Rescue and Fire Fighting] Run Report."

232.     Defendants have sold and/or distributed AFFF, and its toxic PFAS components, to La Crosse and/or LSE for approximately fifty years. Throughout that period, the toxic PFAS components contained in Defendants' AFFF have been released into the environment in significant quantities and migrated into household water supplies throughout the Class Area. As a result, Plaintiffs' and Class members residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property have been contaminated by toxic PFAS.

233.     State and Local entities have not yet analyzed the extent of PFAS contamination at numerous other locations where AFFF was used and escaped into the environment, including, but not limited to, neighborhoods along the surface and groundwater pathways from LSE to the Town, including the Class Area.

**Release, Discharge, and Disposal of PFAS Has Contaminated Groundwater in the Class Area**

234.     Plaintiffs' and Class Members' private wells and groundwater is contaminated with numerous types of toxic PFAS components as a direct and proximate result of LSE's use of AFFF manufactured by Defendants'.

235.     Samples taken from neighborhoods throughout French Island, including the Class Area, discovered PFOS, PFOA, and other toxic PFAS components from AFFF pervade the water supply.

236.     Since the EPA's UCMR3 sampling in 2014, PFAS from AFFF have continuously and increasingly been detected in French Island wells, including the Plaintiffs' and Class Members' wells, above recommended levels for public safety and welfare. June 2021 tests confirmed and expanded these results. In the June 2021 round of testing, 538 private wells on French Island tested positive for PFAS.

**The Threats to Plaintiffs', Class Members', and their Visitors' Health, Safety, and Property Caused by AFFF are Ongoing**

237.     The PFAS contamination caused by Defendants AFFF is not contained and continues to spread into Plaintiffs' and Class Members' property and household water supplies. As result, Plaintiffs' and Class Members' have suffered the annoyance, inconvenience, and discomfort of knowing that for years their health along with their family, friends, and visitors' health was compromised by exposure to toxic PFAS components.

238.     If Plaintiffs' and Class Members' residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property are not remediated, PFAS contamination will continue to impact Plaintiffs' and Class Members' property and household water far into the future because toxic PFAS components resist degradation and are persistent and mobile in water and soil.

**Plaintiffs and Class Members Have Been Harmed by Defendants' Actions**

239.     Plaintiffs and Class Members hereby incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

///

240.     Private wells on Plaintiffs' and Class Members' property have been contaminated by toxic PFAS components contained in AFFF which Defendants designed, manufactured, sold, and/or distributed.

241.     Because of Defendants' design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, Plaintiffs and Class Members properties have been and are being invaded by toxic PFAS components released on and around LSE.

242.     As a direct and proximate result of the contaminated groundwater near LSE, the Plaintiffs and Class Members have suffered, and will continue to suffer, harms and losses.

243.     AFFF, and its toxic PFAS components, sold by the Defendants to LSE used in an intended and foreseeable manner, was released onto LSE property. Thereafter toxic PFAS components in AFFF migrated into surrounding groundwater and physically intruded onto, and contaminated, Plaintiffs' and Class Members' properties, including residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property in the Class Area. PFAS contamination of Plaintiffs' and Class Members' household water supplies, caused by Defendants' AFFF, has further migrated through soils into groundwater, physically contaminating and interfering with Plaintiffs' and Class Members' right to use their household water supplies.

244.     It was reasonably foreseeable that releases of Defendants' AFFF, and its toxic PFAS components, would migrate to Plaintiffs' and Class Members' properties in the Class Area and physically intrude onto, harm, and contaminate those properties including Plaintiffs' and Class Members' residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property owned and used by Plaintiffs and Class Members. Releases of Defendants' AFFF, and its toxic PFAS components, has invaded and interfered with Plaintiffs'

44

and Class Members' possessory interest in the use of their properties and household water supplies.

245.    Defendants knew or reasonably should have known of the aforementioned environmental and health risks associated with AFFF containing toxic PFAS components at minimum thirty-five years prior to the first time Plaintiffs and Class Members were informed of PFAS contamination.

246.    Widespread PFAS have since been detected in private wells in the Class Area used by the Plaintiffs and Class Members. The impact of this widespread contamination caused by the Defendants' tortious conduct has had, and will continue to have, a detrimental impact on the Plaintiffs' and Class Members' property.

247.    Initial testing completed by the Town showed PFAS contamination was widespread.

248.    In March 2021, five months after Plaintiffs and Class Members began to receive information about PFAS contamination when WDHS declared an emergency water advisory in the Class Area.

249.    Plaintiffs' and Class Members' household properties and water supplies have been and are being exposed to PFAS introduced into their residential real property, water supplies, water systems, wells, piping, soil, vegetation, and other property because of Defendants' AFFF, and its toxic PFAS components, released into the environment at and near LSE. As a direct and proximate result of these releases, Plaintiffs and Class Members have suffered harms and losses including, but not limited to, those identified below.

250.    Plaintiffs and Class Members have lost the use and use and enjoyment of their property as a direct result of the contamination of their private wells.

251.     Plaintiffs and Class Members have suffered annoyance and inconvenience as a direct result of Defendants' contamination of their property including, but not limited to, using bottled water and alternative water sources as a direct result of the contamination of their private wells and avoiding consumption of their household water supply.

252.     As a direct result of the contamination and of Plaintiffs' and Private Property Owner Class Members' property in the Class Area, Plaintiffs and Class Members have been suffered harms and losses. The use, value, and marketability of Plaintiffs' and Private Property Owner Class Members' property has been and will continue to be substantially and adversely harmed and diminished, including their ability to use and enjoy their property. Plaintiffs' and Private Property Owner Class Members' residential real properties have suffered the need for and the cost of remediation of the PFAS contamination of their properties water supplies, water systems, wells, piping, soil, vegetation, and other property. Plaintiffs and Private Property Owner Class Members have suffered and will continue to suffer the cost of mitigating the PFAS contamination, caused by Defendants' AFFF, including the cost of obtaining water filters and/or alternative water supplies, and the cost of restoring, using, and maintaining an uncontaminated water supply and/or the increased cost of water supplies.

253.     PFAS have harmed Plaintiffs and Class Members and will continue cause them to suffer harms and losses because the PFAS contamination on their property, caused by Defendants' AFFF, will persist for decades in water and soil and will bioaccumulate in plants and other organisms that exist in the Class Area.

254.     Since Plaintiffs and Class Members learned of the PFAS contamination crisis, they have been and will continue to be forced to suffer lost time as they direct their efforts, energy, resources, and money toward ensuring they have an alternative water supply and are not

needlessly exposed to toxic PFAS components from Defendants' AFFF. Plaintiffs and Class Members have incurred past and present costs directed toward securing alternative water supplies for protection from exposure to toxic PFAS components.

255.   Plaintiffs and Class Members seek compensation for the loss of use, loss of use and enjoyment of their properties, and annoyance, discomfort, and inconvenience caused by the contamination of their properties by Defendants' AFFF containing toxic PFAS components.

256.   Defendants' toxic PFAS contamination of the Class Area has caused Plaintiffs and Class Members many forms of annoyance and discomfort, including, but not limited to, concern over reduction in the value of their property and investment value of their property. Plaintiffs and Class Members have also experienced serious concerns over, how and where to obtain sufficient alternative water supplies, how and where to store sufficient water supplies, and whether their families', friends', and visitors' health and safety have been compromised from exposure to PFAS contaminated water in their homes.

257.   PFAS contamination prevents Plaintiffs and Class Members from fully using their property, including private wells.

258.   It was reasonably foreseeable to Defendants that Plaintiffs and Class Members, as current and former owners of residential real property and users of groundwater that supplied their household water, would consume groundwater contaminated by toxic PFAS components contained in AFFF released from on and around LSE.

259.   Because precise identification of the specific manufacturer of any given AFFF that was the source of toxic PFAS components found in Plaintiffs' and Class Members' household water supply is difficult, Defendants are jointly and severally liable for those indivisible harms and losses which they caused Plaintiffs and Class Members to suffer.

260.     Upon information and belief, Defendants control a substantial share of the market in the United States for AFFF containing toxic PFAS components and are jointly responsible for the contamination of the groundwater, soil, household water supplies, and other property in the Class Area and for causing the harms and losses the Plaintiffs and Class Members have and will suffer.

261.     Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, including PFOS and PFOA, to profit from the use of AFFF containing toxic PFAS components, at Plaintiffs' and Class Members' expense, to foreseeably contaminate Plaintiffs' and Class Members' household water supplies, and to attempt to avoid liability for such contamination of the groundwater.

262.     Each of these Defendants participate in a state-wide and national market for AFFF containing toxic PFAS components during the relevant time. Therefore, enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of liability for the manufacture, sale, and/or distribution and subsequent release of AFFF containing toxic PFAS components at issue in this Complaint.

263.     Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein. Each Defendant acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing toxic PFAS components.

264.     Enterprise liability attaches to all the named Defendants for placing a defective product, AFFF containing toxic PFAS components, into the stream of commerce.

///

///

## DEFINITION OF THE CLASS

265.     This action is brought by the Plaintiffs individually on their own behalf and by the Representative Plaintiffs as representatives of the class defined below:

> All owners of residential real property in the Class Geographic Area with a private well on or after October 20, 2020.

266.     The Class Geographic Area is defined as the Town of Campbell, Wisconsin.

267.     Excluded from the Class are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel of their immediate family members; and (d) any State or any of its agencies.

## COMPLIANCE WITH FED. R. CIV. P. 23 REQUIREMENTS

268.     Plaintiffs and Class Members bring this action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), on behalf of themselves and all other persons similarly situated for the direct, proximate, and foreseeable harms and losses caused by contamination of their household water supplies by toxic PFAS components from Defendants' AFFF. The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and (b)(3).

(I)     <u>Numerosity</u>

269.     The members of the Class are so numerous that joinder of all members is impracticable.  The number of current and former property owners exceed five hundred. There are over one thousand members of the Class who have been exposed to toxic PFAS components released on or around LSE as described herein.  Members can be easily identified from public records such as property tax records, private well construction records, and other

public records such as Accurint, Intelius, and LexisNexis, and notified of the pendency of this action by mail or via other public sources.

(II)   Typicality

270.   The Representative Plaintiffs claims are typical of the claims of the members of the Class since the members of the Class' household water from private wells in the Class Area have been contaminated by toxic PFAS components of AFFF released from LSE and manufactured by the Defendants. Defendants' tortious conduct has resulted in harms and losses to all members of the Class.

(III)   Adequate Representation

271.   The Representative Plaintiffs will fairly and adequately protect the interests of members of the Class and have retained counsel competent and experienced in tort, class action and environmental litigation.

272.   The Representative Plaintiffs and their counsel are committed, and have the resources, to vigorously prosecuting this action on behalf of the Class.

273.   Neither Plaintiffs nor their counsel have interests adverse to any of the other Plaintiffs or the other members of the Class.

(IV)   Predominance of Common Questions

274.   Plaintiffs and Class Members bring this action under Rule 23(b)(3) because numerous questions of law and fact common to Class Members predominate over any question affecting only individual members. The answers to these common questions will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

(a) the type or kinds of toxic PFAS components that have been and are being released from AFFF used at LSE;

(b) the activities of Defendants have resulted in the contamination of the household water supplies and other properties of the Plaintiffs and the Class Members by AFFF containing toxic PFAS components;

(c) the nature and toxicity of the toxic PFAS components from released from LSE;

(d) whether the value and marketability of the property and property rights of Plaintiffs and the Class Member property owners have been and will continue to be diminished by the interference with property rights caused by the contamination as a LSE's releases of Defendants' AFFF, and its toxic PFAS components;

(e) whether the Plaintiffs and Class Member property owners have suffered the need for and the cost of mitigation at and remediation of their PFAS contaminated properties;

(f) whether Defendants owed a duty to Plaintiffs and Class Members;

(g) whether Defendants breached a duty owed to Plaintiffs and Class Members;

(h) whether the PFAS contamination of Plaintiffs' properties by Defendants' actions was reasonably foreseeable;

(i) whether Defendants knew or should have known that their manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, was unreasonably dangerous;

(j) whether Defendants knew of should have known that the toxic PFAS

components in their AFFF were and are persistent, stable, mobile, and likely to contaminate household water;

(k)  whether Defendants were negligent in their design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, to LSE;

(l)  whether Defendants failed to sufficiently warn users of the potential for harm that resulted from their AFFF containing toxic PFAS components;

(m) whether Defendants' actions constitute a trespass;

(n)  whether Defendants' actions constitute a nuisance;

(o)  whether Defendants became aware of the health and environmental harm caused by toxic PFAS components in their AFFF and failed to warn users and Plaintiffs and Class Members of the same;

(p)  whether Plaintiffs and Class Members and their properties have been significantly exposed to toxic PFAS components as a result of Defendants design, manufacture, sale, and/or distribution of AFFF;

(q)  whether the Defendants were unjustly enriched by their action at the expense of Plaintiffs and Class Members; and

(r)   whether Defendants' conduct was wanton, malicious, or oppressive and in reckless disregard for the rights and safety of Plaintiffs and Class Members.

(V)  <u>Superiority</u>

275.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

276.   Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final legal and/or equitable relief with respect to the Class as a whole.

277.     Furthermore, the expense and burden of individual litigation outweighs the individual harms and losses suffered by individual Class Members, making it impossible for members of the Class to individually redress the wrongs done to them.

278.     Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

279.     There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### NUISANCE
(All Defendants)

280.     Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

281.     Defendants' manufacture, sale, and/or distribution of AFFF containing toxic PFAS components constitutes intentional, negligent and/or unreasonably dangerous activity causing unreasonable and substantial interference with the use and enjoyment Plaintiffs' and Class Members' property interests.

282.     Defendants knew and/or should have reasonably foreseen that the invasion of the Plaintiffs' and Class Members' property interests, including their household water supplies, water systems, wells, piping, soils, vegetation, and other property were substantially certain to result from the use of AFFF, and its toxic PFAS components, as Defendants intended, including by LSE. Defendants participated to a substantial extent in the creation, and carrying on, of the nuisance by its actions described above.

283.     Defendants' unreasonable and substantial interference with the use and enjoyment of the Plaintiffs' and Class Members' property interests includes, but is not limited to, the

contamination of their household water supplies, water systems, wells, piping, soil, vegetation, and other property, the need to obtain alternative sources of water and expense thereof, and the exposure to known toxic PFAS manufactured and/or sold and distributed by Defendants.

284.    Defendants' manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, constitutes a pattern of continuous and ongoing tortious conduct.

285.    Toxic PFAS components continue to contaminate Plaintiffs' and Class Members' properties and continue to migrate to Plaintiffs' and Class Members' properties.

286.    As a direct result of Defendants' creation of a nuisance, the household water supply of private wells relied upon by Plaintiffs and Class Members and their residential real property was contaminated with toxic PFAS components.

287.    Defendants' creation of a nuisance caused, is causing, and will continue to cause substantial and unreasonable interference with Plaintiffs and Class Members property rights.

288.    As a direct result of Defendants' conduct, as set forth above, Plaintiffs' and Class Members' property rights and interests, including their rights to free and unthreatened use and enjoyment of their property, has been and will be interfered with unreasonably.

289.    Defendants' invasion of Plaintiffs' and Class Members' properties was intentional and unreasonable.

290.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the Plaintiffs' and Class Members' rights and property. Defendants knew or should have known their actions and inactions were substantially certain to interfere with and invade Plaintiffs' and Class Members' property rights and interests.

291.    Defendants have known for years, or reasonably should have known, that their continued design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS

components, was substantially certain to result in releases into the household water supplied, water systems, wells, piping, soil, vegetation, and other property in the Class Area thereby contaminating Plaintiffs' and Class Members' water supply and exposing them to toxic PFAS components.

292.    Defendants' actions and inactions in creating these conditions have caused, are causing, and will continue to cause unreasonable interference with Plaintiffs' and Class Members' use and enjoyment of their property.

293.    As a direct result of Defendants' conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, wells, piping, soil, vegetation, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur harms and losses reflected in paragraphs 250 through 264.

**SECOND CLAIM FOR RELIEF**
**NEGLIGENCE**
(All Defendants)

294.    Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

295.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF containing toxic PFAS components.

296.    Defendants had a duty to manufacture, market, sell, and/or distribute their AFFF in a manner that avoided contamination of the environment and household water supplies with known hazardous substances and avoided harm to those who would foreseeably be subject to exposure to its toxic PFAS components.

///

55

297.     This duty included identifying, designing, using, and manufacturing alternatives to the toxic PFAS components in its AFFF.

298.     Defendants knew or should have known that the manufacture of AFFF containing toxic PFAS components was hazardous to human health and the environment. Knowing of the dangerous and hazardous properties of the AFFF, Defendants had the duty to warn of the hazards of ingesting water containing toxic PFAS components.

299.     Defendants knew or should have known that it was unsafe, unreasonably dangerous, and/or hazardous to manufacture AFFF using toxic PFAS components because such components would migrate into the environment, including at airports such as LSE, and contaminate the groundwater used to supply Plaintiffs' and Class Members' household water supply.

300.     Given the likelihood that sites where Defendants sold and/or distributed AFFF, including LSE, would become contaminated with toxic PFAS components, Defendants had a duty to investigate the extent to which the toxic PFAS components in AFFF released from such sites were likely to contaminate Plaintiffs' and Class Members' properties and household water supplies.

301.     Knowing of the dangerous and hazardous properties of toxic PFAS components in AFFF, Defendants had the duty to warn of the hazards of ingesting water containing PFAS.

302.     The Plaintiffs and Class Members were foreseeable victims of the harm caused by toxic PFAS components in Defendants' AFFF.

303.     Defendants negligently designed, engineered, developed, fabricated, and tested AFFF, and its toxic PFAS components, and the associated warnings, or lack thereof, and thereby failed to exercise reasonable care to prevent the AFFF, and its toxic PFAS components, from

56

presenting an unreasonable risk of harm to human health and the environment and persons who would come in contact with it, including Plaintiffs and the Class Members.

304.     As a direct result of Defendants' breaches of their legal duties, the household water and private wells surrounding LSE including the affected household water supplies, water systems, piping, wells, soil, vegetation, and other property in the Class Area, have been, and at continue to be, contaminated with toxic PFAS components.

305.     As a direct result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, groundwater and private wells supplying Plaintiffs' and Class Members' household water have been contaminated with toxic PFAS components.

306.     Defendants' negligent manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, and their negligent misrepresentation and failure to warn has interfered with, and continues to interfere with, the property rights of Plaintiffs and Class Members.

307.     Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

308.     As a direct result of Defendants' conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, wells, piping, soil, vegetation, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur harms and losses reflected in paragraphs 250 through 264.

### THIRD CLAIM FOR RELIEF
### NEGLIGENT FAILURE TO WARN
(All Defendants)

309.     Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

310.     At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF containing toxic PFAS components.

311.     As manufacturers, sellers, and distributors of a commercial product, AFFF containing toxic PFAS components, the Defendants had a duty to provide full and adequate instructions and warnings about the health or injury risks posed by their products.

312.     Defendants knew or should have known that the foreseeable storage, use, and disposal of the AFFF, and its toxic PFAS components, that they manufactured, sold, and/or distributed to airports, including LSE, would enter the water supply, persist there for decades, and cause risks to human health, the environment, and harm property.

313.     At the time of the design, manufacture, sale, and/or distribution of their AFFF, Defendants knew or should have known of the dangerous properties of toxic PFAS components contained in AFFF.

314.     At significant times Defendants knew of the dangerous properties of toxic PFAS components contained in AFFF and failed to provide sufficient warnings to the users of AFFF, including LSE, that use and release of Defendants' AFFF to the environment would result in the contamination of groundwater and household water supplies and health risks to those exposed through water supplies.

315.     Upon information and belief, the Defendants failed to provide adequate warnings to the users of the dangers to human health and the environment if toxic PFAS components in AFFF were permitted to contaminate the groundwater and water supplies.

316.     Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release the AFFF containing toxic PFAS components.

317.     Had Defendants provided adequate warnings, the users of their AFFF would have either not used AFFF, or taken measures to store, use, and dispose of AFFF in a manner that reduced or eliminated PFAS contamination of groundwater and household water supplies in the Class Area.

318.     As a direct and proximate result of Defendants' failure to warn against the likelihood of PFAS contamination from their AFFF, the groundwater and household water in the Class Area has been contaminated with toxic PFAS components, and has caused contamination of, and harms and losses to, the Plaintiffs' and Class Members' real property rights and interests.

319.     Defendants' failure to provide adequate warnings or instructions renders Defendants' AFFF, and its toxic PFAS components, a defective product.

320.     As a direct result of Defendants' manufacture, sale, and/or distribution of a defective product, AFFF containing toxic PFAS components, Defendants are strictly liable for harms and losses suffered by the Plaintiffs and Class Members.

321.     Defendants' acts were willful, wanton, and/or reckless and conducted with a reckless indifference to the rights of Plaintiffs and Class Members.

322.     As a direct result of Defendants' conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, wells, piping, soil, vegetation, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur harms losses reflected in paragraphs 250 through 264.

///

///

## FOURTH CLAIM FOR RELIEF
## DEFECTIVE PRODUCT – DEFECTIVE DESIGN
### (All Defendants)

323.    Plaintiffs and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

324.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling and/or otherwise distributing AFFF, and its toxic PFAS components.

325.    It was foreseeable that toxic PFAS components in AFFF that Defendants manufactured, sold, and/or distributed would enter the water supply of the Plaintiffs and Class Members and cause exposure, harm, and losses to their persons and property.

326.    Alternative designs and formulations of AFFF without toxic PFAS components were available, technologically feasible, practical, effective, and would have reduced or prevented the reasonably foreseeable risks of harm and losses suffered by Plaintiffs and Class Members.

327.    Further, design, formulation, manufacture, sale, and/or distribution of AFFF containing toxic PFAS components that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

328.    AFFF manufactured, sold, and/or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the toxic PFAS components in AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous. Because Defendants have failed to do so, they continue to sell and distribute an unreasonably dangerous product, AFFF containing toxic PFAS components.

329.    Defendants' AFFF containing toxic PFAS components were defective at the time of manufacture, and thus, at the time they left Defendants' control.

///

330.     As a direct result of Defendants' manufacture, sale and/or distribution of a defectively designed product, the groundwater, household water supplies, and properties in the Class Area became contaminated with toxic PFAS components and caused Plaintiffs and Class Members to suffer significant harms and losses.

331.      As a direct result of Defendants' design, formulation, manufacture, sale and/or distribution of a defective product, Defendants are strictly liable for the harms and losses suffered by the Plaintiffs and Class Members.

332.     Defendants' acts were willful, wanton, and/or reckless and conducted the design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, with a reckless indifference to the rights of Plaintiffs and Class Members.

333.      As a direct result of Defendants conduct and resulting contamination of Plaintiffs' and Class Members' household water supply, water systems, wells, piping, soil, vegetation, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiffs and Class Members have incurred and will incur harms and losses reflected in paragraphs 250 through 264.

### FIFTH CLAIM FOR RELIEF
### TRESPASS
(All Defendants)

334.     Plaintiffs and Class Members incorporate the allegations in the preceding paragraphs as if fully set forth herein.

335.     Defendants took intentional actions and made intentional omissions in the manufacture, sale and/or distribution of AFFF, and its toxic PFAS components, which in their natural course caused the PFAS contamination of the Plaintiffs' and Class Members' household water supply. Defendants' deliberate and intentional design, manufacture, marketing, sale, and/or distribution of AFFF that contained toxic PFAS components made it natural, inevitable, and a

substantial certainty that releases of such AFFF from LSE would migrate into and contaminate household well water supplies in the Class Area.

336.    Plaintiffs and Class Members in no way consented or provided permission to Defendants' conduct which inevitably resulted in AFFF, and its toxic PFAS components, entry onto and contamination of Plaintiffs' and Class Members' residential real property. As a result, Plaintiffs' and Class Members' household water supply, water systems, wells, piping, soil, vegetation, and other property were invaded and contaminated by toxic PFAS components in Defendants' AFFF. These trespasses occurred in the past, are occurring, and will continue to occur.

337.    As a result of the Defendants' design, manufacture, sale, and/or distribution of AFFF containing toxic PFAS components, releases of AFFF from LSE have physically intruded onto and wrongfully entered the properties owned by Plaintiffs' and Class Members', including their private wells and household water. Defendants' wrongful intrusions onto Plaintiffs' and Class Members' properties has interfered, and continues to interfere, with Plaintiffs' and Class Members' possessory interest in their properties without Plaintiffs' or Class Members' permission.

338.    The physical intrusion of toxic PFAS components contained in Defendants' AFFF and released by LSE onto and into Plaintiffs' and Class Members' properties has physically harmed their properties, including contaminating their properties household water supply, water systems, wells, piping, soil, vegetation, and other property with toxic PFAS components. As a result, Plaintiffs and Class Members have suffered, and will continue to suffer, significant harms and losses.

///

62

339.     The toxic PFAS components from Defendants' AFFF contaminating Plaintiffs'
and Class Members' properties would not have been, and would not be, present but for the
Defendants tortious acts and omissions. Further, Plaintiffs and Class Members would not have
been exposed to toxic PFAS components but for Defendants' tortious conduct. The physical
intrusion of Defendants' toxic PFAS components onto property owned by Plaintiffs and Class
Members have caused significant harms and losses.

340.     Defendants actually and proximately caused the PFAS contamination of
Plaintiffs' and Class Members' residential real property and household water supply.
Defendants' tortious conduct was a substantial factor in the design, manufacture, sale, and/or
distribution of AFFF, and its toxic PFAS components, intended for use, discharge, release, and
disposal of AFFF at LSE which migrated into Plaintiffs' and Class Members' residential real
property and household water supplies.

341.     As a direct result of Defendants conduct and resulting contamination of
Plaintiffs' and Class Members' household water supply, water systems, well, piping, soil,
vegetation, and other real property by the toxic PFAS components of the Defendants' AFFF, the
Plaintiffs and Class Members have incurred and will incur losses reflected in paragraphs 250
through 264.

### SIXTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
(All Defendants)

342.     Plaintiffs and Class Members incorporate by reference the allegations contained in
the preceding paragraphs as if fully set forth herein.

343.     Plaintiffs and Class Members have conferred a benefit upon the Defendant by
bearing the burden of the PFAS contaminated groundwater, household water supply, water

systems, wells, piping, soil, vegetation, and other property that would not have been, and would not be, present but for the Defendants' tortious conduct. Because the Defendants have failed, and refused to, take responsibility for the costs of the pervasiveness, persistence, and toxicity, their AFFF, and its toxic PFAS components, they have saved substantial sums of money they otherwise should have been required to expend to avoid the harms and losses suffered by the Plaintiffs and Class Members. Instead, Plaintiffs and Class Members have been forced to take it upon themselves to incur the cost to mitigate the PFAS contamination of their household water supply, water systems, wells, piping, soil, vegetation, and other property, the lost time of addressing such contamination issues, and the annoyance, discomfort, and inconvenience caused by their property's contamination.

344.    Defendant knew or should have known of the benefit that Plaintiffs and Class Members have been and continue to confer upon them. Defendants profited from the manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components. Defendants continued to profit from the manufacture, sale, and/or distribution of such AFFF, and its toxic PFAS components, for decades after they knew or should have known the environmental and health risks they posed. Therefore, Defendants had knowledge of the profit they were receiving, and continue to receive, at the expense of the harms and losses incurred by Plaintiffs and Class Members.

345.    Defendants knew or should have known that the toxic PFAS components in their AFFF caused harms and losses to Plaintiffs' and Class Members' property rights and interests which Defendants did not bear the financial cost to correct. This conduct resulted in a benefit to the Defendants, and they have not been required to shoulder the burden of the harms and losses Plaintiffs and Class Members have suffered.

346.     Defendants have accepted and/or retained the benefit Plaintiffs and Class Members have conferred, and continue to confer, upon them under circumstances such that it is inequitable for them to retain the benefit gained without payment to the Plaintiffs and Class Members. Defendants profited from the manufacture and sale of AFFF, and its toxic PFAS components, at the expense of Plaintiffs and Class Members properties and health, and continued to do so long after they were aware of the environmental and health risks of their AFFF. Defendants have failed to redesign or recall their products to prevent further release of their AFFF, and its toxic PFAS components, into the environment and Plaintiffs' and Class Members' soil, groundwater, water systems, and household water supply. Plaintiffs and Class Members have been harmed, and suffered losses, by this conduct and are unable to bear the burden of Defendants' consciously, tortiously, wrongful acts and omissions have caused.

347.     It is inequitable for Plaintiffs and Class Members to suffer the harms and losses caused by Defendants' actions and omissions when Defendants knew, should have known, and/or disregarded the risk that the toxic PFAS components contained in AFFF were highly mobile, persistent, toxic, bioaccumulative, and likely to be released into Plaintiffs' and Class Members' water supply through its intended use.

348.     Through Defendants' actions and inaction at the expense of Plaintiffs and the Class Members, Defendants have been unjustly enriched.

349.     The Court should award as a remedy the expenditures saved and the profits obtained by Defendants at the expense of Plaintiffs and the Class Members.

///

///

///

65

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF WISCONSIN UNIFORM FRAUDULENT TRANSFER ACT**
(E.I. du Pont de Nemours and Company, The Chemours Company,
The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)

350.     Plaintiffs and Class Members incorporate by reference the allegations

contained in the preceding paragraphs of this Complaint as if they were fully set forth

herein.

351.     Plaintiffs and Class Members seek equitable and other relief pursuant to

the Wisconsin Uniform Fraudulent Transfer Act (*hereinafter* "UFTA") against E. I.

DuPont, Chemours, Chemours Company, Corteva, and DuPont (collectively the DuPont

Defendants). Wis. Stat. §242.04(1), et seq.

352.     Under the UFTA, "[a] transfer made or obligation incurred by a debtor is

fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer

was made or the obligation was incurred , if the  debtor made the transfer or incurred the

obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or

obligation, and the debtor: (i) was engaged or was about to engage in a business or a

transaction for which the remaining assets of the debtor were unreasonably small in

relation to the business or transaction;  or (ii) intended to incur, or believed or reasonably

should have believed that the debtor would incur, debts beyond the debtor' s ability to pay

as they became due." Wis. Stat. §242.04(1).

353.     The DuPont Defendants have (a) acted with actual intent to hinder, delay

and defraud parties, and/or (b) without receiving a reasonably equivalent value in

exchange for the transfer or obligation, and (i) were engaged or were about to engage in

a business for which the remaining assets of  Chemours were unreasonably small in relation

to the business; or (ii) intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due.

354.     The DuPont Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont's assets out of the reach of parties such as Plaintiff and Class Members that have suffered harms and losses because of the UFTA Defendants' conduct, omissions, and actions described in this Complaint.

355.     It is primarily E. I. DuPont, rather than Chemours, that for decades manufactured, marketed, distributed and/or sold AFFF containing toxic PFAS components with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiffs' and Class Members' household water supply and thereby cause the Plaintiffs and Class Members to suffer significant harms and losses.

356.     As a result of the transfer of assets and liabilities described in this Complaint, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all the liability for harms and losses from the manufacturing, marketing, distribution and/or sale of AFFF containing toxic PFAS components.

357.     At the time of the transfer of its Performance Chemicals Business to Chemours, E. I. DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding E.I. DuPont's liability for harms and losses from the manufacturing, marketing, distribution and/or sale of AFFF containing toxic PFAS components.

358.     The DuPont Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. DuPont believed or reasonably

should have believed that Chemours would incur debts beyond Chemours' ability to pay as they became due.

359.    At all times relevant to this action, the claims, judgment, and potential judgments against Chemours potentially exceed Chemours' ability to pay.

360.    Pursuant to Wis. Stat. §242.04(1), Plaintiff and Class Members seeks avoidance of the transfer of E.I. DuPont 's liabilities for the claims brought in this Complaint and to hold the DuPont Defendants liable for any harms and losses or other remedies that may be awarded under this Complaint.

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class Members request the following relief:

      (a)  for an order certifying the Class under Rule 23 of the Federal Rules of Civil

           Procedure appointing Plaintiffs as Class Representatives and the undersigned

           and Class Counsel;

      (b)  that this matter be scheduled for a jury trial;

      (c)  for judgment against Defendants for compensatory damages on all counts in a

           fair and just amount as established at trial;

      (d)  for disgorgement of the profits and savings which were obtained by the unjust

           enrichment of Defendants through their use of and at the expense of the

           properties of Plaintiffs and Class Members;

      (e)  for an award of enhanced compensatory damages;

      (f)  for alternative injunctive relief to fund a medical monitoring program;

      (g)  for an award of pre- and post-judgment interest, costs and attorney fees; and

      (h)  for such other and further relief as may be just.

Date: October 12, 2023           Respectfully submitted,

                                 FITZPATRICK, SKEMP & BUTLER, LLC

                                 By: */s/ Timothy S. Jacobson*
                                 Timothy S. Jacobson
                                 Attorney Registration # 1018162
                                 1123 Riders Club Rd.
                                 Onalaska, WI 54650
                                 Ph: (608)784-4370
                                 tim@fitzpatrickskemp.com

                                 SINGLETON SCHREIBER, LLP

                                 By: */s/ Kevin S. Hannon*
                                 Kevin S. Hannon

Attorney Registration # 1034348
1641 N. Downing Street
Denver, CO  80218
Ph: (720)704-6028
khannon@singletonschreiber.com

By: */s/ Paul Starita*
Paul Starita *(Pending Pro Hac Vice)*
591 Camino de la Reina #1025
San Diego, CA  92108
Ph: (720)704-6028
pstarita@singletonschreiber.com

By: */s/ Joseph A. Welsh*
Joseph A. Welsh (*Pending Pro Hac Vice*)
1641 N. Downing Street
Denver, CO  80218
Ph: (619)346-4580
jwelsh@singletonschreiber.com